UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JERRY HARVEY AUDIO HOLDING, LLC and JERRY HARVEY AUDIO, LLC,**

                   **Plaintiffs,**

v.                                             **Case No:  6:14-cv-2083-Orl-41DCI**

**1964 EARS, LLC,**

                   **Defendants.**

_____/

**JERRY HARVEY AUDIO HOLDING, LLC and JERRY HARVEY AUDIO, LLC,**

                   **Plaintiffs,**

v.                                             **Case No:  6:16-cv-409-Orl-41LRH**

**1964 EARS, LLC (WA), 1964 EARS, LLC (OR), 64 AUDIO INC., DB AUDIO SYSTEMS & PRODUCTIONS INC. and HARRY CHRISTIAN WITTE,**

                   **Defendants.**

_____/

## ORDER

THIS CAUSE is before the Court on several motions in two related cases. In Case Number 6:14-cv-2083-Orl-41DCI ("2014 Case"), this cause is before the Court on the following: Defendant 1964 Ears, LLC's ("1964 Ears") Motion for Rule 11 Sanctions (2014 Case Doc. 67); Plaintiffs' Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i) (2014 Case Doc. 142); 1964 Ears' Response to Notice of Voluntary Dismissal (2014 Case Doc. 143); 1964 Ears'

Motion for Fees and Costs (2014 Case Doc. 147); 1964 Ears' Motion to Lift Stay (2014 Case Doc. 162); and 1964 Ears' Dispositive Motion to Dismiss Plaintiffs' Claim as Moot and Enter Judgment in Favor of Defendant (2014 Case Doc. 164). In Case Number  6:16-cv-409-Orl-41LRH ("2016 Case"), this cause is before the Court on the following: Plaintiffs' Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i) (2016 Case Doc. 89); 2016 Case Defendants' Notice to the Court (2016 Case Doc. 90); and 2016 Case Defendants' Motion for Fees and Costs (2016 Case Doc. 91).

## I.   PROCEDURAL HISTORY

These related cases are centered around alleged patent infringement of Plaintiffs' patents, which involve canalphones—also referred to as in-ear monitors. (*See generally* Compl., 2014 Case Doc. 1; Compl., 2016 Case Doc. 1). The at-issue motions deal primarily with the procedural aspects of the cases, rather than the substantive merits. Thus, the Court will indulge in a rather lengthy procedural history.

In December 2014, Plaintiffs filed their first Complaint for Patent Infringement against 1964 Ears.[1] (2014 Case Doc. 1 at 1). The 2014 Case alleged infringement of one of Plaintiffs' patents, Patent No. 8,897,463 ("the '463 Patent"). (*Id.* at 2). In response to 1964 Ears filing a Motion to Dismiss (2014 Case Doc. 15), Plaintiffs filed an Amended Complaint (2014 Case Doc. 22), and simultaneously filed a Motion for Preliminary Injunction (2014 Case Doc. 23). In support of the Motion for Preliminary Injunction, the '463 Patent's sole inventor, Jerry Harvey, filed a Declaration (2014 Case Doc. 24). 1964 Ears opposed the preliminary injunction, filed a

---

[1] Plaintiffs later added Easterwood & Associates LLC as a Defendant in the 2014 Case. (Am. Compl., 2014 Case Doc. 22, at 1). However, those claims were settled, and Easterwood & Associates LLC was dismissed. (Mar. 28, 2016 Order, 2014 Case Doc. 109, at 11–12, 20). Thus, the 2014 Case is only discussed as it pertains to 1964 Ears.

Declaration of its Chief Technology Officer, Vitaliy Belonozhko (2014 Case Doc. 125), filed a second Motion to Dismiss (2014 Case Doc. 35), and filed the above-referenced Motion for Rule 11 Sanctions. Before the Court was able to address those motions, however, 1964 Ears filed for *inter partes* review with the Patent and Trademark Office and then moved to stay the 2014 Case. (*See generally* Mot. to Stay, 2014 Case Doc. 97). The stay was granted, and Plaintiffs withdrew the motion for preliminary injunction. (Mar. 28, 2016 Order, 2014 Case Doc. 109, at 21; Notice of Withdrawal, 2014 Case Doc. 128, at 1). The Rule 11 Motion remained pending but was stayed along with the rest of the case.

Meanwhile, Plaintiffs filed their second lawsuit—the 2016 Case. Therein, Plaintiffs asserted infringement of three additional patents—Patent Nos. 8,567,555 ("the '555 Patent"), 8,925,674 ("the '674 Patent"), and 9,197,960 ("the '960 Patent"). (2016 Case Doc. 1 at 2, 4). The 2016 Case again named 1964 Ears as a Defendant as well as  another 1964 Ears company—1964 Ears LLC (WA)—and a company named 64 Audio, Inc. (*Id.* at 4). Plaintiffs alleged that these three businesses operated together as a single business entity. (*Id.*).[2] For purposes of all of the at-issue motions, the 1964 Ears Defendant from the 2014 Case, and the two 1964 Ears Defendants from the 2016 Case, as well as Defendant 64 Audio are all moving together or making identical arguments in the at-issue motions. Accordingly, those parties will be referred to herein collectively as Defendants.

As in the 2014 Case, instead of filing an Answer in the 2016 Case, Defendants filed a Motion to Dismiss (2016 Case Doc. 33). And, as in the 2014 Case, prior to the Court ruling on the Motion to Dismiss, Plaintiffs filed an Amended Complaint. (*See generally* November 29, 2016

---

[2] There were additional Defendants named in the 2016 Case, (2016 Case Doc. 1 at 4–5), but because those Defendants are not involved with any of the at-issue motions, the Court need not address them here.

Order, 2016 Case Doc. 76; Am. Compl., 2016 Case Doc. 77). In response, Defendants again moved

to dismiss. (*See generally* Second Mot. to Dismiss, 2016 Case Doc. 80). Before that motion was

ruled upon, however, Defendants sought and were granted a stay of the 2016 Case pending *inter*

*partes* review. (*See generally* December 19, 2016 Order, 2016 Case Doc. 82).

Accordingly, both the 2014 and 2016 Cases have been stayed while the parties worked

their way through the *inter partes* review process and, in the 2014 Case, an appeal to the Federal

Circuit. In the 2014 Case, the Patent Trial and Appeal Board ("PTAB") found all sixteen claims

of the '463 Patent unpatentable; a decision that was affirmed by the Federal Circuit. (Dec. 16, 2019

Status Report, 2014 Case Doc. 170, at 2). The Mandate in that matter was issued by the Federal

Circuit on May 1, 2019. (*Id.*). Around the same time, the PTAB issued its final written decision in

the 2016 Case, finding all claims in the '555 Patent unpatentable, all but two claims of the '674

Patent unpatentable, and all but one claim of the '960 Patent unpatentable. (Aug. 26, 2019 Status

Report, 2016 Case Doc. 99, at 3). On May 6, 2019, Plaintiffs filed notices of voluntary dismissal,

dismissing without prejudice all remaining claims in both cases. (*See generally* 2014 Case Doc.

142; 2016 Case Doc. 89). Except for the Rule 11 Motion, which Defendants seek to revive, the

motions at issue in this Order were filed post-dismissal.[3]

## II.     RULE 41 DISMISSAL

Plaintiffs filed their notices of voluntary dismissal in both cases pursuant to Federal Rule

of Civil Procedure 41(a)(1)(A)(i), which states that a plaintiff may unilaterally dismiss a case—

without a court order—"by filing . . . a notice of dismissal before the opposing party serves either

an answer or a motion for summary judgment." Defendants did not file an answer or a motion for

---

[3] Plaintiffs also filed a Cross-Motion for Rule 11 Sanctions (2014 Case Doc. 74), but they
have not sought to revive that motion. Therefore, it will be denied as moot.

summary judgment in either case prior to the dismissals.[4] Thus, the notices were properly filed and were self-executing, and therefore, upon those filings, these cases were dismissed; at that time the Court was divested of jurisdiction to address the merits of the underlying claims. *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1277–1281 (11th Cir. 2012). Despite this clear law, Defendants filed multiple documents and motions, asking the Court to set aside the voluntary dismissals. Specifically, in both cases Defendants filed responses to the voluntary dismissals, arguing that dismissal should not be permitted. (*See generally* 2014 Case Doc. 143; 2016 Case Doc. 90). In the 2014 Case, Defendants have also filed a Motion to Lift the Stay (2014 Case Doc. 162) and a Motion to Dismiss (2014 Case Doc. 164), requesting that the Court dismiss Plaintiffs' claims as moot and enter judgment in Defendants' favor. In light of Plaintiffs' effective voluntary dismissal, these motions are legally and procedurally inappropriate and will be denied.

Nevertheless, "after dismissal, the district court retains jurisdiction to consider collateral issues which do not require a determination on the merits, including imposition of . . . sanctions, even after a plaintiff voluntarily dismisses a complaint pursuant to Rule 41(a)(1)." *Zow v. Regions Fin. Corp.*, 595 F. App'x 887, 888 (11th Cir. 2014). Additionally, "[t]he Federal Circuit at least implicitly approved the exercise of similar jurisdiction over a [35 U.S.C.] § 285 claim and a request for Rule 11 sanctions after voluntary dismissal of the underlying case." *Knauf Fiber Glass, GmbH v. Certainteed Corp.*, No. 1:02-cv-1215-DFH, 2004 U.S. Dist. LEXIS 6291, at *5 (S.D. Ind. Mar. 24, 2004) (collecting cases). Thus, the Court will address Defendants' requests for attorneys' fees.

---

[4] In the 2014 Case, Defendants improperly filed an Answer (2014 Case Doc. 145) after the case had been dismissed, which is due to be stricken.

### III.   ATTORNEYS' FEES AND COSTS

Defendants argue that they are entitled to an award of fees and costs under a number of authorities. The Court begins with an analysis with the arguments under 35 U.S.C. § 285 and Federal Rule of Civil Procedure 11.

### A.   35 U.S.C. § 285 Legal Standard

Section 285 states: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." "[A] fee-seeking party must show that it is entitled to § 285 fees by a 'preponderance of evidence,'" *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1305 (Fed. Cir. 2017) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557 (2014)). [5]

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554. "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* To be an exceptional case under this provision, the underlying conduct need not rise to the level of being independently sanctionable, but "a party's unreasonable conduct" must be "so 'exceptional' as to justify an award of fees." *Id.* at 555. Such cases are "rare." *Id.*

---

[5] Federal Circuit law applies to the issue of attorney fees under § 285. *Serio-US Indus. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1321 (Fed. Cir. 2006).

### B.     Rule 11 Legal Standard

As relevant, Federal Rule of Civil Procedure 11(b) provides that, by filing a motion or

pleading, an attorney certifies that to the best of his or her "knowledge, information, and belief,

formed after an inquiry reasonable under the circumstances":

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11(b)(2) and (b)(3) go to whether a claim is legally or factually frivolous. *See*

*Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 664 (11th Cir. 2010). In the Eleventh

Circuit,[6] a Rule 11 challenge as to frivolity requires a two-prong inquiry—"whether the legal

claims or factual contentions are objectively frivolous, and, if so, whether a reasonably competent

attorney should have known they were frivolous." *Thompson*, 610 F.3d at 665. Under the first step,

"[a] factual claim is frivolous if no reasonably competent attorney could conclude that it has a

reasonable evidentiary basis." *Id.* Under the second step, the question is "whether the attorney

should have known they were frivolous" or, stated differently, whether "a reasonable investigation

---

[6] In this case, Eleventh Circuit law applies to the application of Rule 11 sanctions. *See Raylon, LLC v. Complus Data Innovs., Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012) ("In reviewing a district court's decision to deny Rule 11 sanctions, we apply the law of the regional circuit.").

would have revealed the error to a reasonably competent attorney." *Id.* "Both inquiries measure attorney conduct under an objective reasonably competent attorney standard." *Id.*

Rule 11(c) permits sanctions for any violation of Rule 11(b). "The purpose of Rule 11 sanctions is to reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (quotation omitted). Appropriate sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).

### C.    Analysis

As noted, § 285 requires Defendants to establish that they were prevailing parties. However, as discussed below, Plaintiffs' behavior in neither the 2014 nor the 2016 Case warrant an award of attorneys' fees, therefore, the Court need not address the prevailing party issue.

Assuming *arguendo* that Defendants are prevailing parties, they argue that they are entitled to attorneys' fees under § 285 and Rule 11 because Plaintiffs failed to make an adequate pre-suit investigation and because they engaged in litigation misconduct. Both of these factors can be considered under the totality of the circumstances test under § 285, *see Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1307 (Fed. Cir. 2017) (pre-suit investigation); *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1340 (Fed. Cir. 2017) (litigation misconduct), and under Rule 11, *see Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1289 (Fed. Cir. 2012) (applying Eleventh Circuit law and considering pre-suit investigation); *Danubis Grp., LLC v. Landmark Am. Ins. Co.*, No. 6:14-cv-32-Orl-37TBS, 2018 U.S. Dist. LEXIS 135735, at *5 (M.D. Fla. Mar. 13, 2018) (litigation misconduct). The Court will address each in turn.

1.    *Pre-Suit Investigation*

Defendants argue that in both cases Plaintiffs failed to conduct an adequate pre-suit investigation and, if they had, Plaintiffs would have understood that their claims were meritless and would have never filed suit. As an initial matter, the Court notes that it is in an unusual situation because most of Defendants' arguments in this regard involve a presumption that Defendants' accused products did not infringe Plaintiffs' asserted patents. However, because the *inter partes* review process addressed the validity of the patents—not the infringement claims—there has never been a determination of whether the accused products infringed, which means there is an insufficient record to determine the merits of Plaintiffs' infringement claims. *See Deep Sky Software, Inc. v. Sw. Airlines Co.*, No. 10-cv1234-CAB (KSC), 2015 U.S. Dist. LEXIS 180625, at *12 (S.D. Cal. June 1, 2015) ("Because this case was stayed while still in its early stages, there was no claim construction, motion practice or trial as to infringement. While [the defendant] may ultimately have prevailed on its noninfringement argument, there is [an] insufficient record to determine that [the plaintiff's] infringement claim was exceptionally meritless."). Regardless, Defendants have failed to meet their burden to show that Plaintiffs' pre-suit investigation was unreasonable.

a.    2014 Case

As explained, the 2014 Case involved alleged infringement of the '463 Patent. The accused products in the 2014 Case were certain of Defendants' canalphones in their A-series, V-series, and U-series line of products.[7] (2014 Case Doc. 22 at 11). Harvey, the inventor of the '463 Patent, conducted the pre-suit investigation into these products. (Harvey Second Decl., 2014 Case Doc.

---

[7] Specifically, Plaintiffs alleged that Defendants' A10, A12, V8, V6-stage, V6, U6, and U8 canalphones infringed the '463 Patent. (2014 Case Doc. 22 at 11).

73, at 1–2). Harvey has over thirty-eight years of experience in live audio mixing and twenty years of experience in designing and building personal audio listening devices, including canalphones. (*Id.* at 1). Defendants do not dispute that Harvey is an expert in the field. Prior to filing suit, Harvey examined detailed photographs, technical specifications, and descriptions of each accused product. (2014 Case Doc. 24 at 4–8). Harvey also conducted a hands-on examination of the V-series models, including listening to the products and viewing the components through a clear acrylic shell. (2014 Case Doc. 73 at 2–3).[8] While Harvey did not personally inspect the U-series accused products, Defendants' technical and advertising materials available on their website indicate that the U-series products are technically the same as the V-series products; the V-series products simply allow for a custom fit—i.e., the outer shell is customized to fit a particular user—while the U-series products have a universal, non-customizable fit.[9] (2014 Case Doc. 24 at 7). Harvey then conducted an element-by-element, limitation-by-limitation analysis, comparing the accused products to every limitation of the asserted claims and concluded that the accused products infringed the '463 Patent. (2014 Case Doc. 73 at 2).

Defendants argue that this investigation was insufficient. First, Defendants argue generally that if accused products are reasonably available pre-suit and testing can be reasonably conducted, Plaintiffs were required to do so, and failure to conduct such testing is per se unreasonable.

---

[8] Belonozhko's statement that he does not recall seeing Harvey inspect the accused devices at the 2012 trade show, despite the fact that Belonozhko admits he was not at the booth the entire time, is insufficient to call into question the veracity of Harvey's sworn statements. (Belonozhko Second Decl., 2014 Case Doc. 82, at 1). This conclusion is equally applicable to Belonozhko's statement that he does not know of anyone else who saw Harvey do so. (*Id.*). Similarly, Belonozhko's statement that "to the best of [his] knowledge" the V8 sample had a solid color shell instead of a clear acrylic one does not undermine Harvey's sworn statement; Belonozhko does not state that he was at the trade show where Harvey viewed the V8 product and has set forth no basis for personal knowledge of the specific sample available. (*Id.* at 2).

[9] Defendants do not dispute this fact.

However, there is not such a broad, generalized requirement. *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1360 (Fed. Cir. 2019) (noting that the Federal Circuit has "explained that testing of an accused product is not *necessarily* a required part of an adequate pre-filing investigation" and citing cases under Rule 11 and § 285).

Next, Defendants argue that, even if testing is not required in every case, it was required here, and it was required for each and every accused product. Defendants acknowledge that, under controlling law, where there are significant impediments to obtaining accused products, it is not generally reasonable to require Plaintiffs to do so. *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1338 (Fed. Cir. 2007). Nevertheless, Defendants claim that all of the accused products were available "openly and notoriously[] ***before*** Plaintiffs' filed their amended complaint." (2014 Case Doc. 67 at 5 (emphasis in original)). Per Defendants' own evidence, however, that assertion is patently untrue.[10]

Plaintiffs' original Complaint in the 2014 Case was filed on December 19, 2014. It only alleged infringement by the V-series products. The parties agree that these products were available to the general public for purchase at the time. Also, notably, these are the products that Harvey inspected. Plaintiffs filed the Amended Complaint on March 4, 2015, adding allegations regarding the A-series and U-series products. Although Defendants began a Kickstarter campaign to fund the production of its A-series and U-series products in November 2014, (Mar. 27, 2015

---

[10] The Court is particularly concerned that this misrepresentation appears to have been perpetuated by Defendants' counsel. While Belonozhko's Declaration—the source relied on by counsel in her motion—indicates that certain products were introduced in the market via Kickstarter, it does not suggest that those products were obtainable by the general public. In her zeal to represent her client, counsel should always be cognizant of her duties as an officer of the Court.

Belonozhko Decl., 2014 Case Doc. 43, at 1–2), the evidence does not support a conclusion that those products were available for purchase at that time.

To fully understand this concept, the Court must veer slightly off course and explain how Kickstarter works. According to Defendants, Kickstarter is an online "crowd-source funding platform" where "creators"—like Defendants—can "post projects to Kickstarter's website" and "backers" can "submit 'pledges' to a project, and in return, [the backers] generally receive a 'reward.'" (Mar. 23, 2015 Belonozhko Decl., 2014 Case Doc. 35-1, at 4). However, the pledged amount does not immediately go to the project creator. (*Id.*). Instead, Kickstarter holds the pledges until the project is fully funded.[11] (*Id.*). Indeed, the creators cannot ship anything to the backers before the project is fully funded because the creators do not have access to any identifying information until after the funding is closed. (*Id.*).

Here, Defendants' Kickstarter did not close until December 13, 2019, and Defendants acknowledge that none of the A- and U-series models shipped prior to the filing of the 2014 Case. (*Id.*). Indeed, on March 23, 2015—*after* the Amended Complaint had been filed—Belonozhko stated in his sworn Declaration that Defendants had only "recently" obtained the location information of the Kickstarter backers. (*Id.* at 5). Thus, it does not appear that any of the accused A- or U-series products were available to any consumers—much less Plaintiffs—prior to the filing of the Amended Complaint.[12] Indeed, Belonozhko explicitly states, as of March 27, 2015—nearly

---

[11] If it is not funded, the pledges are never collected on, and the funds and identifying backer information are never released to the creators. (2014 Case Doc. 35-1 at 4).

[12] It is also important to note that, as discussed above, the U-series accused products are, from a relevant technical standpoint, the same as the V-series products. Therefore, all of the alleged infringing aspects of the U-series products are also present in the V-series products, which as noted, Harvey personally inspected. So, even if the U-series products were available, and there is no evidence to indicate they were, it was not unreasonable for Plaintiffs to decline to test those products separately from the V-series products.

*a month after* the filing of the Amended Complaint—that Defendants had only just "begun" shipping the A-series products, and even then, the shipments were only to the Kickstarter backers, not the general public. (2014 Case Doc. 43 at 3 ("The A10 and A12 models are 'custom,' . . . [they] are not 'off the shelf' products; we are not mass distributing them, we are simply sending them out to our Kickstarter backers.")).

Theoretically, one could argue that, if Plaintiffs had the gift of premonition, they could have anticipatorily participated in Defendants' Kickstarter campaign in order to eventually obtain these accused products at some point. The Court declines to impose such a requirement. Plaintiffs were not required to know months ahead of time that they were going to file suit against Defendants for infringement regarding products not yet on the market, nor were they required to fund Defendants' development of such products in order to, eventually, obtain a sample product to test. Such an absurd result is not required by the law. *See Intamin*, 483 F.3d at 1338 (determining that the plaintiff was not required to obtain and test samples of the accused product where "unreasonable obstacles" in obtaining such a sample existed).

Accordingly, contrary to Defendants' assertions, Plaintiffs were not required to obtain and test samples of the A- and U-series products prior to filing the Amended Complaint.[13] The Court now moves on to Defendants' remaining challenges to Plaintiffs' pre-suit investigation.

---

[13] Because Defendants' arguments and citations to *Judin v. United States*, 110 F.3d 780, (Fed. Cir. 1997); *Smart Options, LLC v. Jump Rope, Inc.*, No. 12 C 2498, 2013 WL 500861, at *2 (N.D. Ill. Feb. 11, 2013); *Centillion Data Systems, LLC v. Convergys Corp.*, No. 104CV0073LJM-WTL, 2006 WL 20777 (S.D. Ind. Jan. 4, 2006); and *Network Caching Technology, LLC v. Novell, Inc.*, No. C-012079 VRW, 2003 WL 21699799, at *6 (N.D. Cal. Mar. 21, 2003) all involve a presumption that the products were able to be obtained and tested prior to filing suit, they are not applicable here and do not need to be addressed individually.

Defendants focus on two limitations of claim 1 of the '463 Patent, which Defendants' products were alleged to infringe.[14] Defendants argue that their products did not meet these limitations and, therefore, did not infringe the '463 Patent. And they assert that had Plaintiffs engaged in a proper pre-suit investigation, Plaintiffs would have realized this and never filed suit. The first limitation cited by Defendants goes to a system comprising, among other things, two high frequency drivers ("HFD") where "the first [HFD] and second [HFD] are positioned where the oscillation of one interacts with the oscillation of the other to reduce harmonic distortion . . . ." ('463 Patent, 2014 Case Doc. 1-1, at 9 col. 5 ll. 63–67, col. 6 ll. 1–18). For clarity's sake, the Court will refer to this portion of the claim 1 limitation as the "harmonic distortion limitation."

Defendants do not dispute that Plaintiffs' review of the materials on its website was sufficient to apprise Plaintiffs of the fact that all of the accused products have two HFDs. But, Defendants argue that the drivers in the accused products are not positioned where the oscillation of one interacts with the oscillation of the other to reduce harmonic distortion, and according to Defendants, a proper pre-suit investigation would have evidenced this. Again, the Court must make a short detour to discuss the technical aspects involved in this matter.

As explained at the technology tutorial in the 2016 Case, a "driver" is a speaker—in this case a very small speaker—and "frequency" refers to the length of the sound wave created by the speaker, which correlates to the pitch of the sounds produced by those speakers. Thus, a HFD is a speaker that produces high-pitched sounds, often referred to as a tweeter. Next, while no claim

---

[14] In the 2014 Case, Plaintiffs alleged that the accused products infringed claims 1 and 7 of the '463 Patent, but claim 7 is dependent on claim 1, so this argument goes to all allegations of infringement in that case.

construction was performed in this matter, it is a reasonable construction[15] to determine that the "oscillation" referred to in the harmonic distortion limitation refers to the back and forth movement of the sound wave produced by the HFDs. *See* Oxford English Dictionary (3d ed. 2004) ("The action of oscillating; movement to and fro; periodic motion about a position of equilibrium, as the swinging of a pendulum"). Thus, a reasonable understanding of the above-referenced limitation is that the two HFDs are positioned in a manner so that the movement of the sound waves interact to reduce harmonic distortion.

Defendants first argue, generally, that there was no way for Plaintiffs to determine solely from the materials available on Defendants' websites whether the accused products met this limitation. Plaintiffs disagree, pointing to portions of the technical specifications, which state that the armatures or armature drivers inside the canalphones are "balanced" and "tuned." (2014 Case Doc. 73 at 4). According to Harvey, these phrases mean that the drivers produce similar frequencies and are positioned in the manner required by the harmonic distortion limitation. (*Id.*). Despite being aware of Plaintiffs' position on this issue, Defendants do not address or contradict Harvey's assessment in their most recently filed Motion for Fees and Costs. (*See generally* 2014 Case Doc. 147).

Moreover, Harvey has personal knowledge of the HFDs at issue here. Specifically, the positioning of those drivers is done by the manufacturer of the drivers—Knowles Corporation ("Knowles")—which joins them together in a set position. (2014 Case Doc. 73 at 4–5; 2014 Case Doc. 125 at 2). In other words, the "positioning" referred to in the '463 Patent is done by Knowles. (*See* 2014 Case Doc. 73 at 5; 2014 Case Doc. 125 at 2). Harvey "personally worked with Knowles

---

[15] This is not a determination that the above-discussed understanding of "oscillation" is the proper construction, only that it is a reasonable construction for Plaintiffs to have relied upon in determining whether the accused products infringed during their pre-suit investigation.

to design and develop [HFDs] for [Plaintiffs'] dual [HFD] canalphone invention." (2014 Case Doc. 73 at 4–5). Harvey further states that "[t]he [HFDs] sold by Knowles to [Defendants] are the same or substantially similar to those designed and developed by [Harvey]." (*Id.* at 5). Defendants admit that they purchase their dual HFDs from Knowles and that they are "positioned" by Knowles. (2014 Case Doc. 125 at 2). While Belonozhko asserts that "to the best of [his] knowledge" Defendants' do not use the exact same Knowles pre-positioned dual HFDs, he does not dispute Harvey's statement that they are at least substantially similar, nor does he point to any relevant difference between the two. (*Id.*). Thus, it was not unreasonable for Plaintiffs to decline to undertake independent testing of Defendants' HFDs because Harvey had already been extensively involved in development of the same type of drivers, positioned in the same manner, by the same manufacturer.

Finally, with regard to the harmonic distortion limitation, Defendants claim that Belonozhko undertook independent testing that proved Defendants' drivers did not, in fact, reduce harmonic distortion, and therefore, did not infringe the '463 Patent. Belonozhko's testing, however, did not necessarily prove that Defendants' products did not infringe under any reasonable construction of the claim at issue. *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300–01 (Fed. Cir. 2004) (indicating that to undergo an appropriate pre-filing investigation, plaintiffs must merely rely on a reasonable, non-frivolous claim construction). Specifically, Belonozhko tested the total harmonic distortion of the drivers as they are positioned in the accused products—joined together in the specific configuration by Knowles—which resulted in a 0.49% total harmonic distortion. (2014 Case Doc. 125 at 2–3, 7). Belonozhko then tested the drivers split apart and facing away from one another, which resulted in a .047% total harmonic distortion. (*Id.*). Defendants argue that because—according to Belonozhko's testing—there is a HFD configuration

that will result in slightly less total harmonic distortion than the configuration of the HFDs in the accused products, the accused products cannot meet the harmonic distortion limitation. Thus, according to Defendants, the accused products did not infringe the '463 Patent. And, Defendants argue, had Plaintiffs undertaken this simple testing, they would have understood that the accused products did not infringe, therefore, the pre-suit investigation was insufficient and sanctionable.

Even ignoring the question of whether Belonozhko's testing was accurate,[16] it does not conclusively establish non-infringement. On its face, the harmonic distortion limitation does not require the positioning of the HFDs to reduce harmonic distortion more than *any* configuration. It merely states that the HFDs must be positioned in a way as "to reduce harmonic distortion"; the limitation provides no further elaboration. Obviously, the Court did not analyze or construe this limitation, but the specification of the '463 Patent sheds some light on the matter. It states that the claimed system may include two HFDs that are tuned "to deliver lower distortion than a standard canalphone [HFD] and/or lower distortion than two standard canalphone HFDs that are not tuned with each other." (2014 Case Doc. 1-1 at 7 col. 1 ll. 34–39). Thus, it would not be an unreasonable construction argument to say that any configuration that otherwise fits the limitation and that reduces the harmonic distortion more than a *standard* canalphone HFD or two *standard* canalphone HFDs that are not tuned infringes.[17] Nothing in Defendants' evidence establishes whether the .049% total harmonic distortion produced by the accused products is higher or lower than the distortion produced by a standard canalphone HFD or two standard canalphone HFDs that

---

[16] Defendants provide no explanation as to why Belonozhko is qualified to undertake and opine on such testing. His affidavit merely states that he "ha[s] extensive knowledge of canalphone (in-ear-monitors, or "IEMs") design, including knowledge of balanced armature drivers, crossover circuits and acoustical tuning." (2014 Case Doc. 125 at 1). There is no elaboration of Belonozhko's education or experience.

[17] Again, the Court is not determining that this is the correct claim construction, only that it is a reasonable, non-frivolous one.

are not tuned with each other. Thus, because Defendants' testing does not establish conclusively that the accused products do not infringe, it does not establish that the 2014 Case was frivolous or otherwise "extraordinary."

Next, Defendants argue that Plaintiffs failed to conduct a reasonable pre-suit investigation into whether the accused products "produce distinguishable frequencies to a person using the system comprising 12,000 hertz to 18,000 hertz" as required by claim 1 of the '463 Patent. (2014 Case Doc. 1-1 at 9 col. 6 ll. 16–18). Defendants only argument as to this limitation is that Defendants' websites did not provide sufficient information for Plaintiffs to determine whether this limitation was met. This argument is incorrect at least as to the hertz range; that information was provided in the product specifications. (2014 Case Doc. 24 at 4–8). As to the "produce distinguishable frequencies to a person using the system" portion of the limitation—Harvey personally used the two accused products he was able to access, and determined that they met this limitation. Defendants have not explained why any additional investigation would be necessary.

Accordingly, Defendants have failed to meet their burden to show that Plaintiffs' pre-suit investigation in the 2014 Case was insufficient in a manner that warrants an award of fees under either § 285 or Rule 11.

b.    2016 Case[18]

In the 2016 Case, Defendants again argue that they are entitled to fees and costs because Plaintiffs failed to undertake a sufficient pre-suit investigation. However, most of Defendants' argument is centered around the idea that there was a blanket requirement to obtain and test all of the accused products. As discussed above, there is not. Defendants do not explain whether the

---

[18] In the 2016 Case, Defendants only move for fees under § 285.

accused products in the 2016 Case were available, what testing they believe should have been done, or why Plaintiffs' investigation was insufficient. The only specific argument made by Defendants as to the pre-suit investigation in the 2016 Case is that "Defendants provided Plaintiffs with ample evidence . . . demonstrating the accused devices did not meet all limitations." (2016 Case Doc. 91 at 21). Defendants then cite, generally without any pincites or further explanation, to a 100-page document.[19] (*Id.*). The Court will not wade through Defendants' voluminous exhibits in an attempt to make arguments on their behalf. Defendants have failed to meet their burden to show that Plaintiffs' pre-suit investigation was unreasonable in the 2016 Case.

## 2.   *Litigation Misconduct*

As an initial matter, the Court notes that Defendants' arguments regarding Plaintiffs' alleged litigation misconduct are just as insubstantial as the arguments regarding Plaintiffs' pre-suit investigation in the 2016 Case. Indeed, while Defendants provide an extensive factual background regarding the litigation, their actual legal argument pertaining to litigation misconduct consists of a mere two paragraphs that do not provide any analysis as to the specific facts of these cases. (2014 Case Doc. 147 at 22–23; 2016 Case Doc. 91 at 22–23). And, as explained below, it is not obvious to the Court on the face of the factual allegations how Plaintiffs' behavior somehow amounts to litigation misconduct. Additionally, because the parties address the litigation in both the 2014 and 2016 Cases together, the Court will follow suit.

Based on the factual allegations, it appears that Defendants are primarily displeased that Plaintiffs' had the audacity to continue litigating this case despite the fact that Defendants told

---

[19] Similarly, in the factual background, Defendants state: "during oral argument in the '555, '674, and '960 patent IRPs, [Plaintiffs] made numerous arguments demonstrating that under [Plaintiffs'] interpretation of the claims, Plaintiffs failed to engage in a reasonable prefiling investigation." (2014 Case Doc. 147 at 17). Defendants make no further explanation and provide no citation in support.

them that they were wrong. Defendants are apparently shocked that Plaintiffs did not simply take Defendants word at face-value.[20]

Other than complaining that Plaintiffs continued with the litigation, Defendants list a litany of ordinary events and state simply—without any legal argument or analysis—that these events, somehow, demonstrated litigation misconduct. For example, Defendants complain that, in the 2014 Case, Plaintiffs asked for, and were granted, an extension of time to respond to Defendants Motion to Dismiss, (*see generally* Unopposed Mot. for Extension of Time, 2014 Case Doc. 20; Mar. 3, 2015 Order, 2014 Case Doc. 21), and on the following day filed an Amended Complaint (2014 Case Doc. 22), rather than a response to the Motion to Dismiss. Then, on the mooted deadline for Plaintiffs' response to the Motion to Dismiss, Plaintiffs filed a Motion for Temporary Restraining Order (2014 Case Doc. 37). Defendants assert that "[t]he timing of the TRO motion suggested Plaintiffs and their counsel used the extension of time on the motion to dismiss to prepare and file the TRO."[21] (2014 Case Doc. 147 at 4). This allegation is nonsensical. First, there was no deadline for the filing of a temporary restraining order, so any extension of time obtained by Plaintiffs' had no impact on that motion. Second, Plaintiffs *did* respond to the Motion to Dismiss by filing an Amended Complaint. The deadline to respond to the Motion to Dismiss therefore became completely irrelevant. Also, the mooted extension of time had no impact on Defendants— they were free to file any appropriate response as soon as the Amended Complaint was filed. For

---

[20] For example, Defendants take issue with the fact that Plaintiffs did not dismiss the 2016 Case after receiving Defendants' non-infringement contentions and after being served with Defendants' discovery responses. Of course, Defendants fail to explain why this information necessitated the dismissal of the 2016 Case. (2016 Case Doc. 91 at 10). Further, in support, Defendants again cite, generally, to a 100-page document, and they cite two other exhibits that were not filed on the docket. (*Id.* (citing Exhibit 7 to Homen Decl., 2016 Case Doc. 92-7, which is 100 pages, and Exhibits "31-32," which do not appear to exist)).

[21] Notably, this one sentence is the entirety of the legal argument pertaining to this incident, and that is more substantial than their argument relating to most of the alleged facts.

example, the mooted extension of time did not somehow prevent Defendants from filing their second Motion to Dismiss before its expiration, which they, in fact, did. (*See generally* Second Motion to Dismiss, 2014 Case Doc. 35).

Defendants also complain that Plaintiffs did not dismiss the 2014 Case after being served with Defendants Rule 11 Motion. As discussed above, Defendants have not established that Plaintiffs' infringement claims were meritless, so on the record before the Court, Plaintiffs were not required to dismiss at that time. However, the Court is concerned with *Defendants'* actions surrounding the Rule 11 Motion. Prior to filing the Rule 11 Motion, Defendants served Plaintiffs with their proposed Rule 11 Motion, as is required. Defendants' Rule 11 Motion is primarily premised on the assertion that Plaintiffs only reviewed Defendants' websites prior to filing suit and that Plaintiffs conducted absolutely no hands-on testing or inspection of Defendants' products. However, in response to being served with the Rule 11 Motion, Plaintiffs explained to Defendants that this was factually inaccurate, and Plaintiffs provided Defendants with the same information regarding their hands-on testing that they provided the Court. (Ravicher Decl., 2014 Case Doc. 75, at 1–2). Instead of either opting to not file the Rule 11 Motion or, at the very least, changing their Rule 11 Motion to be factually accurate, Defendants made the decision to file the motion as-is.[22] Not only did this result in Defendants knowingly making factual misrepresentations to the Court, it also wasted the Court's time and resources by requiring the Court to sift through Defendants' inaccurate statements and arguments. If any party behaved inappropriately with regard to the Rule 11 Motion, it was Defendants.

---

[22] As justification for not changing the motion Defendants argue that they were not required to "preemptively" respond to Plaintiff's arguments regarding the Rule 11 issues. (2014 Case Doc. 81 at 3–4). While that may be true, Defendants were still required to provide factually accurate information to the Court.

The next group of actions Defendants recite in the factual background are steps Plaintiffs took that actually saved the Court's time and resources. Other than citing generally to all the facts as a basis for their motion, Defendants make no argument as to why these actions constitute misconduct. For example, in response to Defendants' arguments that this Court lacked personal jurisdiction over Defendants in the 2014 Case, Plaintiffs filed a Motion for Jurisdictional Discovery (2014 Case Doc. 61), requesting leave to conduct jurisdictional discovery if the Court were inclined to grant Defendants' request to dismiss for lack of personal jurisdiction. The Court denied the Motion for Jurisdictional Discovery not on the merits of the request but because the Court was inclined to only address personal jurisdiction once. (May 22, 2015 Order, 2014 Case Doc. 66, at 1–2). So, the Court explained, if Plaintiffs felt they needed jurisdictional discovery, they should request to do it before the Court ruled on the then-pending motions. (*Id.*). Thereafter, Plaintiffs decided not to pursue jurisdictional discovery and advised the Court of the same. (May 29, 2015 Notice, 2014 Case Doc. 70, at 1). But in doing so, Plaintiffs pointed out the particular, narrow issue that Plaintiffs were concerned about and highlighted the Court's power to *sua sponte* direct interrogatories to Defendants if the Court needed such information. (*Id.*). There is nothing obvious about this behavior that evidences improper actions by Plaintiffs. Instead it appears that Plaintiffs were concerned about issues relevant to personal jurisdiction, and they filed a motion for jurisdictional discovery to avoid waiving their ability to obtain such discovery.[23] But they were also concerned about the expense and allocation of resources towards such discovery, and after contemplation of the Court's Order, declined to renew their request. Given that Defendants have

---

[23] Notably, a failure to seek jurisdictional discovery in a timely manner can result in a waiver of the ability to do so. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009).

failed to address these actions other than simply reciting the facts, they have failed to meet their burden here.

Defendants provide a similar litany of factual allegations regarding Plaintiffs' un-filed Rule 11 Motions—namely, that Plaintiffs served Defendants with proposed Rule 11 Motions and then, after conferral, decided not to file those motions. But, as they have done repeatedly, Defendants provide no explanation as to why these actions were improper. And, again, the Court finds nothing obvious on the face of Plaintiffs' actions problematic. Indeed, parties are often required to confer for the very purpose of working things out so that motions are not filed. Defendants make no showing that the proposed Rule 11 Motions were sent to Defendants for any inappropriate purpose. Similarly, Defendants have alleged facts regarding Plaintiffs' decision to withdraw their Motion for Preliminary Injunction, but yet again, offer no argument related to why it was improper for Plaintiffs to do so. It is not obvious to the Court why Plaintiffs' decision was improper given that they did so after substantial changes had occurred in the litigation and it had become clear that the case was going to be stayed pending the *inter partes* review process.

Next, Defendants provide a number of factual allegations regarding Plaintiff's conduct during the *inter partes* review and Federal Circuit appeal process that Defendants apparently believe show litigation misconduct. First, the Court is perplexed as to why Defendants did not seek remedies before the PTAB and Federal Circuit if Plaintiffs' litigation tactics were inappropriate. *See Taltech Ltd. v. Esquel Enters. Ltd.*, 604 F.3d 1324, 1334 (Fed. Cir. 2010) (noting that reviewing courts are particularly "ill-suited to weigh" evidence of litigation misconduct because it is "context-specific"); *see also Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1181 (Fed. Cir. 2018) ("[The defendant's] failure to provide early, focused, and supported notice of its belief that it was being subjected to exceptional litigation behavior further supports the

District Court's determination that [the plaintiff's] litigating position did not stand out from others." (quotation omitted)).

Nevertheless, the allegations regarding Plaintiffs' litigation conduct in those forums appear to be in line with Defendants' allegations—and complete lack of legal argument—regarding Plaintiffs' conduct before this Court. For example, Defendants complain that Plaintiffs waited until the deadline to file a motion for rehearing and an appeal of the PTAB's final decision in the 2014 Case, asserting that this was an "obvious attempt" to delay the proceedings. (2014 Case Doc. 147 at 11, 14). First, Plaintiffs filed these matters *within* the given timeframe to do so, and Defendants have provided absolutely no indication as to why this was some sort of "obvious" ploy. Second, the Court finds Defendants allegations on this point particularly interesting given that in both the 2014 and 2016 Cases Defendants allowed the one-year deadline for filing *inter partes* review to nearly expire before doing so. (*See* Mot. to Stay, 2014 Case Doc. 97, at 4 (noting that service was effective on January 23, 2015), 6 (noting that "on January 21, 2016, in advance of the one-year service anniversary, Defendant filed a Petition with the PTO seeking *inter partes* review"); Mot. to Stay, 2016 Case Doc. 84, at 1 (noting that service was effective on March 15, 2016), 2 (noting that Defendants filed for *inter partes* review on March 15, 2017—the deadline to do so)).

Defendants also appear to take issue with Plaintiffs decision to "rest on their briefs" at oral argument before the PTAB and the Federal Circuit but then, simultaneously, object to Plaintiffs' counsel using Defendants' demonstratives to make "extensive argument." (2016 Case Doc. 91 at 13). First, the Court does not understand how Plaintiffs' decision to rest on their briefs could in any way prejudice Defendants or be improper. Given Defendants' general lack of explanation regarding any of these issues, they do not answer that question. Moreover, at the PTAB oral argument, while Plaintiffs' counsel did state that he was "content with [Plaintiffs'] briefs" and

would "rest on those," (PTAB Hr'g Tr., 2016 Case Doc. 92-19, at 5),[24] he then immediately stated that there were "[j]ust a few issues which I think the Board has already highlighted today to discuss," and went on to make argument and answer questions, (*id.* at 5–27). Defendants have not explained why this utterly unremarkable event was somehow improper.

Plaintiffs' counsel behaved in a similar manner at the Federal Circuit. (Oral Argument, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings (search "Jerry Harvey")). Interestingly, Defendants' counsel also primarily rested on her briefs at the Federal Circuit Oral Argument. (*Id.*). While Defendants seem to blame Plaintiffs for this decision, there was no indication by the Federal Circuit that Defendants were required to limit their argument merely because Plaintiffs did so. (*See id.* (Defendants' counsel stating that she would rest on her briefs because Plaintiffs' counsel did, but no one from the appellate panel limiting her argument in such a way, which can be compared to instructions from the appellate panel to Plaintiffs' counsel on rebuttal, stating before Plaintiffs began: "no new issues"). The Court is at a loss to determine how Plaintiffs' counsel's decision to limit his argument to narrow issues—which likely avoided wasting the Federal Circuit's and PTAB's time with duplicative argument—somehow amounts to litigation misconduct.

Defendants also take issue with Plaintiffs' arguments before the PTAB and Federal Circuit regarding claims of unnamed real parties in interest. Although not entirely clear, Defendants seem to be indicating that Plaintiffs' arguments in this regard were legally untenable. However, Defendants have provided no legal authority or explanation regarding why these arguments were problematic—they simply complain that Plaintiffs continued to make them.

---

[24] Where original page numbers and electronic page numbers are different, the Court refers to the electronic page numbers.

The only issue set forth by Defendants that appears to be at least facially a legitimate complaint involves Plaintiffs failure to make Harvey available for a deposition during the *inter partes* review process. However, Defendants merely state, without citation, that they were entitled to depose Harvey under the *inter partes* review discovery rules. Further, Defendants fail to explain why Plaintiffs' partial objection to the striking of Harvey's affidavit was improper. Moreover, even if this one discovery issue was problematic, it alone is not sufficient to support a finding of an extraordinary case under § 285, *see Boyd's Bit Serv., Inc. v. Specialty Rental Tool & Supply, Inc.*, 332 F. Supp. 2d 938, 944 (W.D. La. 2004), *aff'd*, 137 F. App'x 351 (Fed. Cir. 2005) (finding that "dilatory conduct during discovery was *one factor* in supporting the determination of an exception case under the totality of circumstances" but only finding an award of fees appropriate because there were multiple other problems (emphasis added)), and such conduct certainly does not rise to the higher standard under Rule 11.

In sum, while the Court has not discussed every single fact alleged by Defendants—which it is not required to do since Defendants failed to explain or provide legal authority for why its laundry list of facts were sufficient for an award of fees—it has addressed the primary complaints. Both sides appear to have aggressively litigated this matter, and it appears that counsel simply did not like one another. Such litigation conduct is far from "exceptional." And, frankly, it is surprising that Defendants' counsel would come to the Court making allegations against Plaintiffs with unclean hands. As discussed at length above, Defendants' counsel have made several misrepresentations to the Court in furtherance of their positions and have filed several meritless motions and post-dismissal filings. And, Defendants seem to have themselves undertaken many of the actions they accuse Plaintiffs of doing inappropriately. The only thing "exceptional" about this

case is the amount of time spent on these motions. Defendants have not met their burden to establish an entitlement to fees under § 285 or Rule 11.

### 3. *28 U.S.C. § 1927 and Inherent Authority*

An award of sanctions in this case under both 28 U.S.C. § 1927 and the Court's inherent authority require a higher standard of misconduct to be proven than under § 285—they require a showing of bad faith. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007). For the reasons stated above, Defendants have not demonstrated that Plaintiffs acted in bad faith. Sanctions will not be awarded under either § 1927 or the Court's inherent authority.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant 1964 Ears, LLC's ("1964 Ears") Motion for Rule 11 Sanctions (2014 Case Doc. 67); 1964 Ears' Motion for Fees and Costs (2014 Case Doc. 147); 1964 Ears' Motion to Lift Stay (2014 Case Doc. 162); 1964 Ears' Dispositive Motion to Dismiss Plaintiffs' Claim as Moot and Enter Judgment in Favor of Defendant (2014 Case Doc. 164); and the 2016 Case Defendants' Motion for Fees and Costs (2016 Case Doc. 91) are **DENIED**.

2. Cross-Motion for Rule 11 Sanctions (2014 Case Doc. 74) is **DENIED as moot**.

3. Pursuant to Plaintiffs' Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i) (2014 Case Doc. 142) and Plaintiffs' Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i) (2016 Case Doc. 89) this case has already been **DISMISSED without prejudice**.

4. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on March 31, 2020.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record